NONPRECEDENTIAL DISPOSTION
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued February 8, 2010
Decided June 16, 2010

**Before**

WILLIAM J. BAUER, *Circuit Judge*

TERENCE T. EVANS, *Circuit Judge*

JOHN DANIEL TINDER, *Circuit Judge*

No. 09-1188

| | |
|---|---|
| WALTER R. LEGG, | Appeal from the United States District |
|       *Plaintiff-Appellant*, | Court for the Central District |
| | of Illinois. |
|   *v.* | |
| | No. 1:05-cv-01354-JBM-BGC |
| ED PAPPAS, Police Chief in his | |
| official and individual capacity, et al., | Joe Billy McDade, |
|       *Defendants-Appellees*. | *Judge*. |

**O R D E R**

In this Section 1983 case, Walter Legg alleges that various law enforcement officers and the City of East Peoria, Illinois, violated his Fourth Amendment rights by using excessive force and denying him medical care while detaining and transporting him from his brother's house to a squad car. The defendants, on the other hand, portray the incident as an ordinary arrest of a severely intoxicated person. The parties filed cross motions for summary judgment, and the defendants filed motions in limine to exclude the testimony of Legg's expert witnesses. The district court granted the defendants' motion for summary

judgment and one of their motions in limine.  Legg appeals.

On March 31, 2005, Legg went to his brother's house in East Peoria, Illinois. Throughout the afternoon and evening he and his brother (his name is Robert) drank alcohol and smoked marijuana.  Sometime after midnight, Legg went to sleep on Robert's living room floor.  That same day, the Multi-County Narcotics Enforcement Group (MEG)[1] obtained a search warrant for Robert's house because he was suspected of selling marijuana. The next morning, MEG officers along with East Peoria patrol officers executed the search warrant.  The MEG officers discovered Legg lying on the floor near the living room.  He was extremely intoxicated.  On top of that, he had urinated on himself.

After MEG officers secured the house, one of them asked Officer Steven Agee, an East Peoria police officer, to run a warrant check on Legg.  When the check showed that Legg had outstanding warrants from Peoria County, he asked Agee to take Legg to jail. Sergeant Christopher Hutt, another East Peoria police officer, joined Agee inside the house. Although Legg was conscious, he was extremely intoxicated and mumbling as he rolled around on the floor.  Agee and Hutt directed Legg to stand up, but he told them he could not.  Believing Legg to be too drunk to walk on his own, Agee and Hutt picked him up by standing on either side of him and grabbing his bicep and wrist.  Using this technique, they took him outside to the squad car.  Legg's body was limp and his head bounced around as Agee and Hutt took him out of the house.  His legs also dragged on the ground.  Robert said that Legg's bouncing head "whacked" a banister.  Robert, however, later recanted his statement and explained that he never saw Legg's head strike anything.

After Legg was placed in the back seat of his squad car, Agee drove him to the Tazewell County Jail.  Correctional officers at the jail, however, refused to accept Legg in his clearly intoxicated state.  Instead, they directed that he be taken to a hospital.  An ambulance then drove Legg to Pekin Hospital's emergency room.  Two nurses—including one who was specially trained to recognize spinal cord injuries—evaluated Legg and concluded that he had no injuries and that he was just very drunk.  Indeed, his blood alcohol concentration was .254.[2]  Dr. Jon Oakley also evaluated Legg.  During the evaluation, Legg told Dr. Oakley, a board-certified emergency physician, that "there's nothing wrong with me, I'm just drunk."  Dr. Oakley decided that Legg did not need further treatment.  He was discharged him from the hospital and returned to the jail.

---

[1] MEG is an inter-agency unit comprised of officers from various central Illinois law enforcement agencies.

[2] Very drunk indeed: it is illegal to drive an automobile with a blood alcohol concentration of .08 or higher in Illinois.

Back in the jail, Legg dozed off in a holding cell and when he woke up, he said he hurt "everywhere, from head to toes." Robert was in the same facility and could hear Legg requesting help and telling the staff that he could not move. The same day, Legg was transported to the Peoria County Jail, and his wife bailed him out about an hour later. He went home with his wife and climbed up the stairs with her assistance, took a bath, and went to bed. He woke up the next day and was losing feeling in his hands and feet. His wife called an ambulance. Once paramedics arrived, he walked to the ambulance with help from his wife. Legg was transported to OSF Saint Francis Medical Center where Dr. William Hanigan, a neurosurgeon, diagnosed him with central cord syndrome.[3] Fortunately, Legg has largely healed and is now able to participate in most normal activities.

Several months after his injury, Legg filed a complaint in federal court alleging that Agee, Hutt, and several MEG officers used excessive force against him and unreasonably deprived him of medical care in violation of his Fourth Amendment rights. He also sued East Peoria Police Chief Edward Pais and the City of East Peoria for violating his Fourth Amendment rights by establishing the unconstitutional policy of encouraging the use of excessive force by its officers.

Legg enlisted the help of two expert witnesses for his case: W. Ken Katsaris and Dr. R. Douglas Collins. Katsaris is a "police practices" expert and planned to testify about the various ways in which the officers violated police practice rules. Dr. Collins was prepared to give his expert opinion about the cause of Legg's injury.

The parties filed cross motions for summary judgment. The defendants additionally sought to exclude the testimony of Katsaris and Dr. Collins. They argued that Katsaris' testimony should be excluded because police practices are irrelevant in analyzing a claim under the Fourth Amendment. The district court granted the defendants' summary judgment motion and excluded Katsaris' testimony regarding police practices. Further, it determined that Dr. Collins' testimony was unnecessary because it did not reach the issue of causation.

We first review the district court's decision to exclude the expert testimony of W.

---

[3] Central cord syndrome is caused by damage to gray matter nerve cells and crossing spinothalamic tracts (the part of the spine that transmits messages to the brain about pain and temperature) near the central canal of the spine. It typically produces disproportionately greater motor impairment in upper compared to lower extremities, and differing degrees of sensory loss below the level of the injury. Anthony S. Fauci et al., *Harrison's Principles of Internal Medicine* 2589 (17th ed., 2008).

Ken Katsaris.[4]  "We review [the] district court's rulings on [the] motions in limine for an abuse of discretion because decisions regarding the admission and exclusion of evidence are peculiarly within the competence of the district court." *Von der Ruhr v. Immtech International, Inc.*, 570 F.3d 858, 862 (7th Cir. 2009) (internal quotations and citations omitted).  The district court excluded Legg's expert because his testimony about police department policies and standards of police practice was irrelevant to determining what is objectively reasonable under the Fourth Amendment.  We agree.  In the exact same context—while granting a motion to exclude expert testimony about police practices in a Section 1983 excessive force case—we have held that "the violation of police regulations or even a state law is completely immaterial as to the question of whether a violation of the federal constitution has been established." *Thompson v. City of Chicago*, 472 F.3d 444, 454 (7th Cir. 2006).  Furthermore, while explaining why a traffic search did not violate the Fourth Amendment, the Supreme Court stated that "police enforcement practices, even if they could be practicably assessed by a judge, vary from place to place and from time to time.  We cannot accept that search and seizure protections of the Fourth Amendment are so variable and can be made to turn upon such trivialities."  *Whren v. United States*, 517 U.S. 806, 815 (1996).  It is therefore clear that the district court did not abuse its discretion by deciding that Katsaris' testimony was irrelevant.

That having been said, we move to the summary judgment issues.  Summary judgment is proper when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2).  We review grants of summary judgment de novo and construe all facts and inferences in favor of the non-moving party.  *Delta Consulting Group, Inc. v. R. Randle Construction, Inc.*, 554 F.3d 1133, 1137 (7th Cir. 2009).

A Section 1983 claim for excessive force by police officers making an arrest or other seizure is analyzed under the Fourth Amendment's reasonableness standard.  *Abdullahi v. City of Madison*, 423 F.3d 763, 768 (7th Cir. 2005) (citations and quotations omitted).  Essentially, the court must weigh "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake."  *Graham v. Connor*, 490 U.S. 386, 396 (1989) (citations and quotations omitted).  Mere negligence, however, is not enough to support a constitutional claim. *Franks v. Delaware*, 438 U.S. 154, 171 (1978).

---

[4] On appeal, Legg has dropped his claims against the City of East Peoria and Chief Edward Pais and the various MEG officers.  Only his claims against Agee and Hutt remain.  He also argues that existing summary judgment law violates the Seventh Amendment.  This argument is frivolous, so we do not discuss it here.  *See In re Peterson*, 253 U.S. 300, 310 (1920); *Burks v. Wisconsin Dept. of Transportation*, 464 F.3d 744, 759 (7th Cir. 2006).

Legg argues that officers Hutt and Agee used excessive force while transferring him from Robert's residence to the squad car. But we agree with the district court that the undisputed facts show Hutt and Agee acted reasonably. Although there are slight differences between the accounts of the various witnesses, none of the differences are material. Essentially, officers discovered Legg passed out on the floor after a night of drinking and smoking marijuana. Once they found out that he had outstanding warrants, Agee and Hutt moved Legg out of the house by each grabbing a bicep and wrist. There is simply no evidence that either Hutt or Agee intentionally or recklessly harmed Legg. The undisputed facts show two police officers properly transporting an extremely intoxicated individual from a house to a squad car and nothing more. Therefore, the district court was correct in granting summary judgment.

Finally, Legg argues that Agee and Hutt violated his Fourth Amendment rights by unreasonably denying him medical care. Whether the officers acted reasonably is determined by four factors: the officers' notice of the arrestee's medical needs; the seriousness of the medical needs; the scope of the requested treatment; and police interests. *Williams v. Rodriguez*, 509 F.3d 392, 403 (7th Cir. 2007). All four factors show that Hutt and Agee behaved reasonably. First, there is nothing in the record that suggests that Hutt or Agee had notice that Legg was in need of medical care. By all accounts, it appeared that Legg was just plain drunk. Furthermore, neither he nor his family members said he needed medical care. Indeed, when Legg went to the hospital, he told Dr. Oakley that "there's nothing wrong with me, I'm just drunk." The second factor is of no help to Legg because he was not in serious medical need at the time he was transported from his brother's house. Furthermore, since no one requested treatment, the third factor also shows that Agee and Hutt behaved reasonably. Finally, the police had an interest in taking Legg into custody because he had outstanding warrants. Since none of the factors favor Legg, the district court's grant of summary judgment was proper.

For these reasons, the judgment of the district court is AFFIRMED.